| | |
|---|---|
| Ellerbrock Family Trust, LLC; Belmont Strategic Income Fund, LP, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>McGladrey & Pullen, LLP,<br><br>Defendant. | Case No. 08-cv-05370-JRT-FLN<br><br>**AMENDED**<br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMANDED** |

Plaintiffs Ellerbrock Family Trust, LLC ("Ellerbrock") and Belmont Strategic Income Fund, LP ("Belmont"), on behalf of themselves and all other persons similarly situated, for their Complaint against Defendant McGladrey & Pullen, LLP ("M&P"), state and allege as follows:

## INTRODUCTION

1.      During September 2008, a federal investigatory task force assembled in the District of Minnesota uncovered a massive fraudulent Ponzi scheme perpetrated by Thomas J. Petters and his cohorts.  Petters and several of his co-conspirators were charged with multiple federal felonies and more charges are expected.  Several have pleaded guilty to some of the charges.  At present, the total losses involved in this swindle reportedly exceed the staggering sum of $3 billion.  Virtually all of the Petters companies have recently filed Chapter 11 bankruptcy petitions.

2.      The essence of this scam was the completely fictitious sale of high-definition flat screen television sets and other expensive electronic consumer products by the Petters organization to consumer wholesale clubs, including Sam's Club, Costco Wholesale, and BJ's Wholesale Club.  Phony purchase orders and invoices were prepared and provided to persons

who loaned money to the Petters Group, including numerous investment funds, which had in turn obtained money from private investors as their fiduciaries.

3.      In the federal investigation, FBI agents took the phony purchase orders and invoices directly to Sam's Club and Costco Wholesale to obtain confirmation of their legitimacy, and were immediately informed that they were completely bogus.  The Petters conspirators knew this could happen and discussed it among themselves: "[I]f investors send auditors out to visit warehouses where the merchandise is located, …the scheme would implode."

4.      When a certified public accounting firm audits a client's financial statements, its duty is to exercise due professional care, professional skepticism and objectivity, and to develop and follow procedures, analyses, and tests to verify the legitimacy and accuracy of the client's assets, liabilities, operations, and cash flow.  When it comes to three partnerships that invested huge sums of money in the Petters confidence game, the defendant in this case, McGladrey & Pullen, a very large and highly respected independent certified public accounting firm, failed its duty.  Had it done its job, the partners of those funds would not be in the financial straits they find themselves in today.

## PARTIES

5.      Plaintiff Ellerbrock is a Florida limited liability company.  Ellerbrock is an investment vehicle for its sole member, Momentum Capital Partners, LP ("Momentum").  Ellerbrock and Momentum are principally operated out of the home of their general partner and managing member in Boca Raton, Florida.

6.      Plaintiff Belmont is a Texas limited partnership.  Belmont is an investment fund for its limited partner investors.  Belmont's principal place of business is in Dallas, Texas.

7.      M&P is an Iowa limited liability partnership with its principal office located at 3600 American Boulevard, Bloomington, Minnesota.  M&P is a national certified public

accounting firm with approximately 100 offices located throughout the United States. One of its specialties is the auditing of financial service entities.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction pursuant to the provisions of the Class Action Fairness Act, 28 U.S.C. § 1332(d) and 1711 et seq. and the common law of the State of Minnesota. The amount in controversy greatly exceeds the sum of $5 million, exclusive of interest and costs.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b).

**FACTUAL BACKGROUND**

**The Ellerbrock Investments**

10. Starting in or about November 2003, Ellerbrock invested in and became a limited partner of an entity based in Northbrook, Illinois, named Lancelot Investors Fund, LP ("Lancelot I"). Lancelot I has served as an investment vehicle for its general and limited partners.

11. Lancelot I and its general partner are managed solely and entirely by an individual named Gregory Bell.

12. From its inception in or about September of 2001, Lancelot I focused its investment strategies on short-term trade finance notes. These notes, generally of 120-270 days' duration, evidence loans made by Lancelot to special purpose vehicles ("SPVs"), which in turn use the funds to acquire and sell goods to retailers. Because these loans are to be made only after the SPVs have received a valid purchase order from the retailer, this investment vehicle is sometimes referred to as "purchase order financing."

13. To date, Ellerbrock has invested over $4.8 million in Lancelot I, including the reinvestment of interest purportedly earned on its investment.

14.     In or about March 2005, Ellerbrock was interested in making an additional investment in Lancelot I, but was informed by Bell that the fund was closed due to preexisting limitations.  However, Bell informed Ellerbrock that he was starting another fund in which Ellerbrock could invest, Colossus Capital Fund, LP ("Colossus").

15.     From its inception in or about January 2005, Colossus focused its investment strategy on asset-backed loans and related investments.  The assets supporting these loans include both current assets, such as inventory and accounts receivable, and long-term assets.

16.     In or about March 2005, Ellerbrock made its initial investment in Colossus.  Over time, Ellerbrock has invested and reinvested a total of approximately $2.2 million in that fund.

17.     Accordingly, to date Ellerbrock has a total of approximately $7 million invested in Lancelot I and Colossus.

## The Belmont Investments

18.     Lancelot Investors Fund II, LP ("Lancelot II') was formed by Bell in January 2003.  Lancelot II engaged in the same business as Lancelot I and Colossus, namely asset-backed loans and related investments.

19.     On May 5, 2008, Belmont initially invested $5.55 million in Lancelot II. Thereafter, the manager of Lancelot II contacted Belmont on several occasions to invest additional funds, which Belmont did, namely, July 5, 2008, at which time Belmont invested an additional $1.5 million, and on September 5, 2008, Belmont invested an additional $3 million.

20.     The manager of Lancelot II provided Belmont with M&P's 2006 and 2007 audit reports before Belmont invested in the fund.

## M&P's Role in Lancelot I and II and Colossus

21.     On November 1, 2006, M&P acquired Altschuler, Melvoin & Glasser, LLP ("AMG"), a Chicago-based certified public accounting firm.  In announcing that acquisition,

M&P stated that AMG has "a long reputation of quality, expertise and care and concern for its clients and people that fits perfectly with the culture of M&P."

22.     Following commencement of operations, the financial statements of Lancelot I, Lancelot II and Colossus have been audited annually by AMG and later M&P.  In all of those audits, the three funds were given unqualified opinions that their financial statements presented fairly, in all material respects, their financial position and the results of their operations, changes in partners' capital, and their cash flow for each year, in conformity with accounting principles generally accepted in the United States (GAAP).

23.     As of year-end 2007, M&P issued its unqualified opinion on the financial statements of Lancelot I, stating assets of $238.4 million and partners' capital (net assets) of $218.1 million.    The same audited financial statements disclosed interest income of $33.3 million, and net income of $33.4 million.  The M&P Audit Report, dated March 28, 2008, is attached hereto and incorporated herein as Exhibit A.

24.     Following the same pattern, the audited financial statements for Lancelot II at year-end 2007 stated assets of $239.9 million and partners' capital (net assets) of $218.9 million. Audited interest income was $39 million and net income $31.3 million.  The M&P Audit Report, again dated March 28, 2008, is attached hereto and incorporated herein as Exhibit B.

25.     Similarly, the audited financial statements for Colossus at year-end 2007 stated assets of $55.8 million and partners' capital (net assets) of $38.2 million.   Audited interest income was nearly $5.5 million and net income nearly $6.5 million.  The M&P Audit Report, likewise dated March 28, 2008,  is attached hereto and incorporated herein as Exhibit C.

26.     The audited financial statements for previous years revealed similar stellar investment results.  Ellerbrock and Belmont, and on information and belief, all other limited

partners of Lancelot I and II and Colossus, received and relied on the M&P/AMG audit reports in connection with making their investments and reinvestments, and holding them in the three funds.

## Recent Events:  Disclosure of the Fraud

27.    In late September 2008, it was publicly announced that the United States Department of Justice was investigating an alleged fraud of truly monumental proportions involving numerous businesses and individuals affiliated with Thomas J. Petters, The Petters Group Worldwide, LLC, and Petters Company, Inc.  Thomas J. Petters is a Minnesota resident and the aforementioned entities have their principal places of business in Minnetonka, Minnesota.

28.    This fraud was described in a Criminal Information filed by the U.S. Attorney for the District of Minnesota as a "massive Ponzi scheme" involving more than $3 billion.

29.    On September 26, 2008, Gregory Bell sent an e-mail to the investors/limited partners of Lancelot I, Lancelot II and Colossus informing them that its principal borrower is an "unidentified SPV" that is affiliated with Petters Group Worldwide.  Bell stated that the unidentified SPV is also an issuer of notes held by the funds and notes in which the funds held security interests.  Bell also suggested that the federal investigation created uncertainty about the SPV's creditworthiness and the value of the funds' notes.  Finally, Bell indicated that the funds would likely be forced to suspend redemptions, which would prevent investors from recovering their funds.

30.    The following day, September 27, 2008, Bell issued another e-mail regarding the three funds, stating that "It is clear that we will have no choice but to terminate the funds and commence an orderly liquidation of the fund's assets.  Therefore, we will be ceasing all

redemptions, effective immediately. At this point, it is impossible to determine the extent to which any assets will be available for distribution to investors."

31. During mid-October 2008, virtually all of the Petters companies filed petitions under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the District of Minnesota. For example, in its filing, the SPV that did "loan business" with Lancelot I (Thousand Lakes LLC) listed the amount of Lancelot I's claim as $1,527,109.00.

32. Ellerbrock demanded redemption of its investments from Lancelot and Colossus, but received no response.

33. On October 16, 2008, a conference call was held for all limited partner investors in the Lancelot and Colossus Funds. During that conference call, counsel for the funds and their general partner explained that approximately 90% of the assets of Lancelot I were invested with the Petters organization, 95% of Lancelot II's assets were so invested, and approximately 12% of Colossus's assets were so invested. Clearly, the extremely high concentration of investments in worthless "Petters loans" rendered impossible the continued existence of Lancelot I and Lancelot II as viable going concerns.

34. And, on the late afternoon of October 20, Lancelot I, Lancelot II, Colossus, and their sister funds all filed petitions in the U.S. Bankruptcy Court for the Northern District of Illinois, seeking complete liquidation under Chapter 7. A true and correct copy of Bell's e-mail notice informing the partners of the funds of that action is attached hereto and incorporated herein as Exhibit D.

### The Criminal Proceedings

35. Several principals of the Petters entities, and other co-conspirators and participants, have been criminally charged for their responsibility in the massive fraudulent scheme described in the September 19, 2008 Affidavit of Special Agent Timothy Bisswurm of

the Federal Bureau of Investigation. A true and correct copy of Mr. Bisswurm's Affidavit is attached hereto and incorporated herein as <u>Exhibit E</u>.

36. Thomas J. Petters, Robert D. White, Frank Vennes, Deanna Coleman, Michael Catain and Larry Reynolds have been charged with federal mail fraud, wire fraud, money laundering, and obstruction of justice. Mr. Petters was jailed without bond on Friday, October 3, 2008. Since then, all but Mr. Petters and Mr. Vennes have pleaded guilty to one or more charges.

<b><u>Class Action Allegations</u></b>

37. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those persons who invested in Lancelot I, Lancelot II and Colossus from the inception of each fund to the present, and who received and relied on the financial reporting and audits of M&P/AMG and were damaged thereby.

38. The members of the class are so numerous that joinder of all members is impracticable. The class consists of individual persons and entities numbering in the scores, and perhaps hundreds. Their investments are of varying size. The persons and entities that comprise the class are located in different states.

39. Plaintiffs' claims are typical of the claims of the members of the class, as all members of the class are similarly affected by Defendant's wrongful conduct complained of herein.

40. Plaintiffs will fairly and adequately protect the interests of the members of the class, and have retained counsel competent and experienced in class actions and commercial litigation.

41.     The common questions of law and fact exist as to all members of the class and predominate over any question solely affecting individual members thereof.   Among the questions of law and fact common to the class are:

a.      whether Defendant negligently audited the financial statements of Lancelot I and II and Colossus; and

b.      the extent to which the members of the class have been damaged, and the proper measure of damages.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.   In addition, because the damages suffered by individual class members may vary, the expense and burden of individual litigation makes it impracticable for members of the class to individually redress the wrongs done to them.   Finally, there will no difficulty in the management of this action as a class action.

43.     The Court should certify a class of plaintiffs consisting of all investors who became limited partners in Lancelot Investors Fund, LP, Lancelot Investors Fund II, LP and Colossus Capital Fund, LP from their inception until the funds ceased accepting limited partners, but expressly excluding Gregory Bell and all persons directly or indirectly involved in or affiliated with the persons or entities that managed the funds.

## Cause of Action: Professional Negligence

44.     Plaintiffs Ellerbrock and Belmont restate and reallege each of the preceding allegations as if fully stated herein.

45.     Defendant's audit reports were specifically addressed and directed to the partners of Lancelot and Colossus, including Plaintiffs and all members of the class.   *See, e.g.*, Exhibit A, page 1, Exhibit B, page 1, and Exhibit C, page 1.   Defendant expected and intended the limited

partner investors in Lancelot I and II and Colossus to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of its audits.

46. In performing audits of financial statements, certified public accountants are required to follow generally accepted auditing standards ("GAAS") in arriving at their opinion that financial statements are fairly stated in accordance with GAAP.

47. When performing an independent audit of a client's financial statements, a professional certified public accountant is obligated to follow these standards, among others:

    a. In all matters relating to the performance of the audit, the auditor is obligated to exercise and maintain professional skepticism and an independence in mental attitude.

    b. Due professional care must be exercised in the performance of the audit and the preparation of the audit report.

    c. A sufficient understanding of internal control must be obtained to plan the audit and to determine the nature, timing and extent of tests to be performed.

    d. Sufficient competent evidential matter must be obtained by inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit. This includes seeking and obtaining reliable information from independent sources, including third parties.

    e. The auditor has the responsibility to plan, supervise and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

48.     In performing its audit of the Lancelot I and II and Colossus financial statements, M&P breached its duty to Plaintiffs and the other similarly situated persons by violating one or more of the aforesaid auditing standards.  For example, it is utterly incongruous and inexplicable that bogus purchase orders and invoices could be taken to Sam's Club and BJ's Wholesale Club last month and then immediately denounced as fraudulent, while barely five months before, M&P issued unqualified opinions on Lancelot I and II's and Colossus's financial statements.  Any reasonable and minimal investigation of third parties would have uncovered the fraud during any of the multiple audits.  Obviously, this was not done.

49.     In performing its audits of the financial statements of Lancelot I and II and Colossus, M&P negligently and carelessly failed to follow GAAS discussed above.  As a result, M&P consistently issued unqualified opinions that the financial statements of Lancelot and Colossus fairly presented their financial condition in accordance with GAAP, when, in fact, these financial statements were materially false and misleading.

50.     As a direct and proximate result of M&P's breach of its duties to them, Plaintiffs and the members of the putative class have suffered and will continue to suffer damages vastly greater than $15 million, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Ellerbrock and Belmont respectfully pray that the Court grant the following relief:

1.     The Court certify a class of plaintiffs consisting of all investors who became limited partners in Lancelot Investors Fund, LP, Lancelot Investors Fund II, LP and Colossus Capital Fund, LP from their inception until the funds ceased accepting limited partners, but expressly excluding Gregory Bell and all persons directly or indirectly involved in or affiliated with the persons or entities that managed the funds;

2.      Following a trial on the merits, Plaintiffs and the members of the class be awarded damages greater than $15 million, in an amount to be proven at trial;

3.      Plaintiffs Ellerbrock and Belmont, and the members of the class, be awarded their costs, disbursements, and attorneys' fees to the greatest extent permitted by law; and

4.      The Court order such further or additional relief as it deems just, proper, and equitable.

## JURY DEMAND

Pursuant to Fed. R. Civ. Pro. 38(b), Plaintiffs demand trial by jury on all issues so triable.


Dated:  October 23, 2008                    WINTHROP & WEINSTINE, P.A.


By: s/Geoffrey P. Jarpe
    Robert R. Weinstine, #0115435
    Geoffrey P. Jarpe, #0049761
    William A. McNab, #0320924

225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400

**Attorneys for Plaintiffs**

## ACKNOWLEDGMENT

The undersigned, hereby acknowledges that pursuant to Minn. Stat. § 549.211, Subd. 2, costs, disbursements and reasonable attorney and witness fees may be awarded to the opposing party or parties in this litigation if the Court should find that the undersigned acted in bad faith, asserted a claim or defense that is frivolous and that is costly to the other party, asserted an unfounded position solely to delay the ordinary course of the proceedings or to harass; or committed a fraud upon the Court.

Dated:  October 23, 2008                                WINTHROP & WEINSTINE, P.A.


                                                        By:s/Geoffrey P. Jarpe
                                                            Robert R. Weinstine, #0115435
                                                            Geoffrey P. Jarpe, #0049761
                                                            William A. McNab, #0320924

                                                        225 South Sixth Street
                                                        Suite 3500
                                                        Minneapolis, Minnesota 55402
                                                        (612) 604-6400

                                                        **Attorneys for Plaintiffs**

4104398v1